**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

|  |  |
|---|---|
| Shawn Souza, | No. CV-23-02588-PHX-DWL |
| Plaintiff, | **ORDER** |
| v. | |
| True North Management Services LLC, et al., | |
| Defendants. | |

Pending before the Court is a motion to compel arbitration filed by Defendants True North Management Services LLC ("True North") and Congruex LLC ("Congruex"). (Doc. 15.) For the following reasons, the motion is denied.

## BACKGROUND

### I.   Factual Allegations

On December 12, 2023, Plaintiff initiated this action by filing the complaint. (Doc. 1.) The relevant factual allegations bearing on the current dispute are as follows.

In February 2021, Plaintiff was hired by non-party A&M Communications Company, LLC ("A&M") to serve as a project manager. (*Id.* ¶ 11.)

On an unspecified later date in 2021, A&M was acquired by Congruex. (*Id.* ¶ 12.) Following this acquisition, Congruex "merged" A&M "with" True North, which was another subsidiary of Congruex. (*Id.*) Afterward, "True North and . . . Congruex were joint employers of Plaintiff." (*Id.* ¶ 16.)

In June 2021, Plaintiff entered into a "Mutual Arbitration Agreement" (hereinafter,

the "Arbitration Agreement") with Insperity PEO Services, L.P. ("Insperity") and A&M. (Doc. 15-1.)[1]

In March 2023, Plaintiff took "paid sick leave for covered health care needs." (Doc. 1 ¶ 20.)

In April 2023, as a result of Plaintiff's wife's "serious health impairment due to seizures," Plaintiff requested additional paid sick leave or leave under the Family and Medical Leave Act. (*Id.* ¶ 22.)

In June 2023, Plaintiff was unexpectedly terminated. (*Id.* ¶ 30.) At the time of termination, "Plaintiff was more than 42 years" old. (*Id.* ¶ 32.)

Based on these and other allegations, Plaintiff asserts the following two claims: (1) violation of the Age Discrimination in Employment Act; and (2) violation of the anti-retaliation provisions of the Arizona Paid Sick Leave Act. (*Id.* ¶¶ 48-67.)

II.   Motion To Compel Arbitration

On February 20, 2024, Defendants filed the pending motion to compel arbitration. (Doc. 15.) Enclosed as an attachment to the motion is the Arbitration Agreement. (Doc. 15-1.) There are three parties to the Arbitration Agreement: (1) Plaintiff, who is defined as "you" or "I"; (2) A&M, which is defined as "Client Company"; and (3) Insperity, which is defined as "Insperity." (*Id.* at 2.)

As for the scope of the Arbitration Agreement, § 1 provides as follows:

> **1.     Mutual Arbitration Agreement**.   Except as this Arbitration Agreement otherwise provides, Insperity, you, and Client Company mutually agree to resolve by arbitration the following, which constitute "**Covered Claims**": (a) all claims or disputes related to or arising out of my application for employment, my employment, or the termination of my employment with Insperity and/or Client Company, (b) all claims that Insperity and/or Client Company may have against me, and/or (c) all claims that I may have against Covered Persons.  "**Covered Persons**" means: (i) Insperity and its parents, subsidiaries, affiliates, and dbas, and their respective officers, directors, employees, or agents, (ii) Insperity's benefit plans, plan sponsors, fiduciaries, administrators, and their respective affiliates or agents, and/or

---

[1]     Insperity was A&M's "third-party human resources provider." (Doc. 17 at 2.)

(iii) Client Company and its officers, directors, employees, affiliates or agents.  Any and all Covered Persons may enforce this Arbitration Agreement.  All Covered Claims will be decided by a single arbitrator through final and binding arbitration and not by way of court or jury trial.

(*Id.*)

Additionally, § 7 of the Arbitration Agreement provides as follows:

7.     **Entire Agreement; Miscellaneous**.  This Arbitration Agreement is the full and complete agreement of the parties about mediation and arbitration of Covered Disputes.   Any contractual disclaimers Client Company and/or Insperity and/or parents, subsidiaries, affiliates, and dbas have in any handbooks, other agreements, or policies do not apply to this Arbitration Agreement.  This Arbitration Agreement does not alter the at-will status of your employment with Client Company and/or Insperity and/or its parents, subsidiaries, affiliates, and dbas.  This Arbitration Agreement shall be governed by the Federal Arbitration Act, 9 U.S.C. § 1 et seq. and evidences a transaction involving commerce.  If the Federal Arbitration Act does not apply, Insperity, the Client Company, and I mutually stipulate and agree that the Texas Arbitration Act will apply.  The term "including" means "including without limitation."   This Arbitration Agreement will automatically inure to the benefit of Insperity's parent, subsidiaries, affiliates, successors, and assigns, in addition to Insperity PEO Services, L.P.  This Arbitration Agreement shall survive the termination of your employment with Insperity and/or Client Company and may be enforced by any one or more of the same, without need of any further agreement or action from you.  This Arbitration Agreement in no way creates or alters any separate agreement you have with the Client Company.

(*Id.* at 9.)

Also attached to Defendants' motion are a pair of declarations.   In the first declaration, a Congruex vice president avows that Congruex is the parent corporation of Congruex Group, LLC, which is the parent company of both A&M and True North and that those two entities "are affiliates . . . under the common ownership of Congruex Group, LLC." (Doc. 15-2 ¶¶ 3-8.)  In the second declaration, a True North general manager avows that all "[e]mployees of A&M were transitioned to True North on 1/1/23," that "A&M as an entity still exists as an affiliate of True North," and that "[n]ew work and hires are being handled through the True North entity."  (Doc. 15-3 ¶ 5.)

On February 28, 2024, Plaintiff filed a response in opposition to the motion to compel arbitration.  (Doc. 17.)

On March 13, 2024, Defendants filed a reply.  (Doc. 18.)  Neither side requested oral argument.

## DISCUSSION

I.   <u>Legal Standard</u>

The Federal Arbitration Act ("FAA") applies to contracts "evidencing a transaction involving commerce."   9 U.S.C. § 2.   Under the FAA, written agreements to arbitrate disputes "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."   *Id.*   Thus, absent a valid contractual defense, the FAA "leaves no place for the exercise of discretion by a district court, but instead mandates that district courts shall direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed."   *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985).

In general, a district court's role under the FAA is "limited to determining (1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute at issue."   *Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000).   These two issues are sometimes referred to as the "gateway" questions of arbitrability.   *Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63, 68-69 (2010).

Although the parties do not frame it this way, the dispute here is essentially whether Congruex and True North, despite being non-signatories to the Arbitration Agreement, qualify as third-party beneficiaries who may enforce it.   *Comer v. Micor, Inc.*, 436 F.3d 1098, 1101 (9th Cir. 2006) ("[N]onsignatories can enforce arbitration agreements as third party beneficiaries."); *Cristales v. Scion Group LLC*, 478 F. Supp. 3d 845, 850-51 (D. Ariz. 2020) (same).   Courts generally characterize such disputes as raising gateway issues of arbitrability.   *See, e.g., Swiger v. Rosette*, 989 F.3d 501, 507 (6th Cir. 2021) (explaining that "a nonsignatory's ability to enforce an arbitration agreement concern[s] a question of arbitrability" and that "whether a nonsignatory can enforce the arbitration agreement is a

question of the enforceability of the arbitration clause, as to that defendant") (cleaned up); *Fundamental Admin. Servs., LLC v. Patton*, 504 F. App'x 694, 698 (10th Cir. 2012) (suggesting, in a case involving a similar dispute over whether non-signatories qualified as "affiliates" who could enforce an arbitration agreement, that whether the non-signatories were "entitled to enforce the agreements as third-party beneficiaries" presented "a threshold matter which must be established before the FAA can be invoked") (cleaned up).

As the parties seeking to compel arbitration, Defendants bear the burden of proof. *Ashbey v. Archstone Property Mgmt., Inc.*, 785 F.3d 1320, 1323 (9th Cir. 2015).   "In determining whether parties have agreed to arbitrate a dispute, we apply general state-law principles of contract interpretation, while giving due regard to the federal policy in favor of arbitration by resolving ambiguities as to the scope of arbitration in favor of arbitration. The presumption in favor of arbitration, however, does not apply if contractual language is plain that arbitration of a particular controversy is not within the scope of the arbitration provision."  *Mundi v. Union Sec. Life Ins. Co.*, 555 F.3d 1042, 1044-45 (9th Cir. 2009) (applying this principle when deciding whether non-signatory to arbitration agreement could compel arbitration) (cleaned up).  *See also Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 631 (2009) (noting that "traditional principles of state law allow a contract to be enforced by . . . nonparties to the contract through . . . third-party beneficiary theories") (quotation marks omitted).  Here, both sides agree that Arizona law applies.  (Doc. 17 at 3-4; Doc. 18 at 2-3.)

II.   The Parties' Arguments

Defendants argue that, although they are not signatories to the Arbitration Agreement, it still applies here because (1) under § 1 of the Arbitration Agreement, Plaintiff must arbitrate any claims against "Covered Persons"; (2) that term is further defined in § 1 of the Arbitration Agreement as encompassing all of A&M's "officers, directors, employees, affiliates or agents"; (3) the term "affiliate" is defined in Black's Law Dictionary to mean "a 'corporation that is related to another corporation by shareholdings, or other means of control; a subsidiary, parent or sibling corporation'"; and (4) each

1  Defendant falls within that definition of "affiliate," as Congruex is A&M's and True

2  North's parent corporation (and True North thus qualifies as A&M's sibling).  (Doc. 15 at

3  2, cleaned up.)

4       Plaintiff responds that Defendants may not enforce the Arbitration Agreement

5  against him because they "are not 'Covered Persons' nor are they 'affiliates' of A&M."

6  (Doc. 17 at 2.)[2]  According to Plaintiff, the term "affiliate" cannot be interpreted in the

7  broad manner that Defendants suggest because there are various clauses in §§ 1 and 7 that

8  specify how the Arbitration Agreement applies to Insperity's "parents, subsidiaries,

9  affiliates, and dbas" and/or "parents, subsidiaries, affiliates, successors or assigns."  (*Id.* at

10 2-4.)  Plaintiff argues that because the Arbitration Agreement "omits identical language for

11 A&M," this omission "means the successors, assigns, parent, or subsidiaries [of A&M] are

12 excluded" pursuant to "the contract principle of *expression unius est exclusion alterius*."

13 (*Id.* at 1, 4-5.)  Plaintiff also argues that "[m]ultiple dictionaries, statutes, and court opinions

14 set forth varied meanings of the word 'affiliate'" and thus contends that there is "no reason

15 to apply the Black's Law Dictionary definition of 'affiliates,'" particularly where using

16 that definition would "render redundant or surplusage the different terms in the list of

17 entities for [A&M] compared with the list for Insperity."  (*Id.* at 5-6.)  Plaintiff concludes:

18 "[T]he [Arbitration] Agreement drafter failed to define 'affiliate' but its meaning must

19 differ from the meanings of the terms parent and subsidiary, successor and assign, in order

20 to give each word meaning. . . .  Defendants' definition would require the Court to pervert

21 the language or add terms to the [Arbitration] Agreement, which is not permitted . . . .  If

22 the parties to the Arbitration Agreement intended to include the successors, assigns, parent

23 and subsidiary of [A&M] as Covered Parties that could enforce the terms, the drafter should

24 have included the same language that it set forth for Insperity."  (*Id.* at 6-7.)

25       In reply, Defendants argue that any ambiguities in the meaning of the term

26 "affiliate" should be resolved in favor of arbitration (Doc. 18 at 2, 4); that it is permissible

27

28 _____

[2]      Plaintiff also argues that Defendants may not enforce the Arbitration Agreement as assignees of A&M (Doc. 17 at 1, 4-5), but Defendants clarify in their reply that they are not proceeding under an assignment theory (Doc. 18 at 2).

under Arizona law to look to dictionaries when determining the meaning of words in a contract (*id.* at 3); that "[r]egarding the use of the term 'parent' in one section but not the other, contract terms do not need to be entirely mutually exclusive in order to be applied in accordance with their ordinary meaning" (*id.*); that Black's Law Dictionary is a respected source when defining contractual terms (*id.*); and that Defendants would qualify as "affiliates" even under the definitions adopted in the cases cited by Plaintiff (*id.* at 3-4).

III.   <u>Analysis</u>

The arbitrability dispute here boils down to whether Congruex and True North qualify as "Covered Persons" under the Arbitration Agreement.  (Doc. 15-1 at 2 ["Any and all Covered Persons may enforce this Arbitration Agreement."].)   Under § 1 of the Arbitration Agreement, the term "Covered Persons" is defined as follows:

> "**Covered Persons**" means: (i) Insperity and its parents, subsidiaries, affiliates, and dbas, and their respective officers, directors, employees, or agents, (ii) Insperity's benefit plans, plan sponsors, fiduciaries, administrators, and their respective affiliates or agents, and/or (iii) [A&M] and its officers, directors, employees, affiliates or agents.

(*Id.*) Defendants' theory, as noted, is that they fall within part (iii) of this definition because they are "affiliates" of A&M by virtue of their respective statuses as A&M's corporate parent (Congruex) and A&M's corporate sibling (True North).

The Arbitration Agreement does not define the term "affiliates."  In an effort to fill this definitional void, Defendants ask the Court to adopt the definition of the term "affiliate" supplied in Black's Law Dictionary, *i.e.*, "[a] corporation that is related to another corporation by shareholdings or other means of control; a subsidiary, parent, or sibling corporation." *Affiliate*, Black's Law Dictionary (11th ed. 2019).  At first blush, this proposal is appealing.  *Centerpoint Mechanic Lien Claims, LLC v. Commonwealth Land Title Ins. Co.*, 530 P.3d 1151, 1160 (Ariz. Ct. App. 2023) ("[I]n the absence of express definitions within a contract, we may consider dictionary definitions to assist in determining the ordinary meaning of words.").  However, adopting Defendants' proposed definition would create a surplusage problem, as various provisions within §§ 1 and 7 of

the Arbitration Agreement discuss how it applies to the "parents, subsidiaries, affiliates, and dbas" and/or "parent, subsidiaries, affiliates, successors, and assigns" of Insperity. (Doc. 15-1 at 2, 9.)  If, as Defendants contend, the term "affiliates" *already* encompasses an entity's parent, subsidiaries, and other related entities, it would have been unnecessary to specify in §§ 1 and 7 how the Arbitration Agreement applies not only to Insperity's affiliates, but also to Insperity's parent, subsidiaries, and other related entities.

Given this backdrop, the Court concludes that the parties to the Arbitration Agreement intended to adopt a definition of the term "affiliates" that excluded "parents," "subsidiaries," "dbas," "successors," and "assigns."  *Gray v. GC Services, LP*, 540 P.3d 1240, 1244 (Ariz. Ct. App. 2023) ("In interpreting a contract, we consider the language used according to its plain and ordinary meaning, viewed in context of the entire contract, unless it can be shown that the parties intended a special meaning.  We also attempt to reconcile and give effect to all terms of the contract to avoid any term being rendered superfluous.") (cleaned up).  To conclude otherwise would violate the "cardinal rule of contract interpretation that we do not construe one term of a contract to essentially render meaningless another term."  *Aztar Corp. v. U.S. Fire Ins. Co.*, 224 P.3d 960, 975 (Ariz. Ct. App. 2010).

With this understanding in mind, the arbitrability analysis as to Congruex is straightforward.  Defendants' only theory as to why Congruex qualifies as an "affiliate" of A&M is because Congruex is A&M's parent.  But as discussed, the parties to the Arbitration Agreement did not intend for the term "affiliate" to encompass an entity's parent.  It follows that Congruex does not qualify as A&M's "affiliate" and thus does not qualify as a "Covered Person" under § 1 of the Arbitration Agreement, as would be required for Congruex to be entitled to compel enforcement as a non-signatory.  Nor may Congruex avoid this outcome by invoking the principle that ambiguities in an arbitration agreement should be resolved in favor of arbitration—given the Arbitration Agreement's clear distinction between "affiliates" and "parents," there is no ambiguity as to Congruex. *Cf. Mundi*, 555 F.3d at 1044-45 ("The presumption in favor of arbitration . . . does not

apply if contractual language is plain that arbitration of a particular controversy is not within the scope of the arbitration provision.") (cleaned up).

This leaves True North. Although the parties' briefing is not a model of clarity on this point, Plaintiff appears to argue that True North cannot qualify as an "affiliate" of A&M because True North is at least the "successor" of A&M, which is a term that must mean something other than "affiliate" to avoid surplusage. (Doc. 17 at 2 ["[T]he Defendants named in this case, i.e., the successor-entities to his employer."]; *id.* at 3 ["[T]he named Defendants as successor-entities to [A&M] are not entitled to enforce the Agreement."]; *id.* at 6-7 ["If the parties to the Arbitration Agreement intended to include the successors, assigns, parent and subsidiary of [A&M] as Covered Parties that could enforce the terms, the drafter should have included the same language that it set forth for Insperity."].) Defendants reply that "neither True North or Congruex are 'successors' of A&M—A&M still exists as an affiliate of True North and has merely decided to share operations with True North." (Doc. 18 at 2.)

In the Court's view, neither side has done a particularly compelling job of explaining why True North should (or should not) be considered a "successor" of A&M. Plaintiff's arguments on this issue are mostly conclusory, and Plaintiff never proffers a definition of "successor" that he believes should apply here. Meanwhile, although Defendants place heavy emphasis on the fact that A&M still exists as an entity, Defendants do not explain (or cite authority discussing) why this should matter for purposes of the "successor" analysis. Nor do Defendants proffer their own definition of the term "successor" that should apply here.

With this backdrop in mind, two considerations ultimately tip the scale in Plaintiff's favor on this point. The first is that, as Defendants acknowledge, True North assumed total control over A&M's employees and operations in 2023. (Doc. 15-3 ¶¶ 4-5 ["[A&M] was not performing well. As a result, ultimately the decision was made to have True North leadership run the combined operations of A&M and True North. Employees of A&M were transitioned to True North on 1/1/23. . . . New work and hires are being handled

through the True North entity."]; Doc. 15 at 2-3 ["[Plaintiff] was, alongside all other employees of A&M, transitioned to True North on January 1, 2023."].)  Although "[t]here is, and can be, no single definition of 'successor' which is applicable in every legal context," *Howard Johnson Co., Inc. v. Detroit Local Joint Executive Bd., Hotel and Restaurant Emp. & Bartenders Int'l Union, AFL-CIO*, 417 U.S. 249, 262 n.9 (1974), the Court finds it significant that other courts have concluded, under analogous circumstances, that an entity that has assumed control over another entity's operations and employees should be deemed a "successor" for purposes of compelling arbitration.  *Hose v. Washington Inventory Serv., Inc.*, 2018 WL 6649238, *6 (S.D. Cal. 2018) (concluding that "RSW is a successor for the purposes of WIS's arbitration agreements" where the evidence showed that "RSW acquired WIS's assets, operates substantially the same business, and employs the same employees").  Second, and perhaps more important, the burden falls onto Defendants in this context to demonstrate why arbitration should be compelled.  *Ashbey*, 785 F.3d at 1323.  Nevertheless, Defendants have made no meaningful effort to explain why True North should *not* be considered A&M's "successor"—instead, Defendants simply offer the circular assertion that True North and A&M are "affiliates," without making any attempt to explain how the terms "successor" and "affiliates" should be defined so as to avoid redundancy.  *Gray*, 540 P.3d at 1244 ("We also attempt to reconcile and give effect to all terms of the contract to avoid any term being rendered superfluous.") (cleaned up).  This showing is insufficient to meet Defendants' burden.

Accordingly,

**IT IS ORDERED** that Defendants' motion to compel arbitration (Doc. 15) is **denied**.

Dated this 29th day of May, 2024.

_____
Dominic W. Lanza
United States District Judge